THE MINNIE.

THE SAGAMI.

(District Court, E. D. New York. February 5. 1910.)

Shipping (§ 81*)—Injury to Tow by Striking Rocks—Liability of Meeting Vessel.

The tug Minnie, with seven barges in tow on hawsers in two tiers, the first tier being 130 feet or more in width, had passed through Hell Gate, going up East River, when she met a transfer tug with a car float on each side, which was followed by the steamship Sagami. The transfer stopped some 150 feet from the Ward's Island shore to permit the tow to pass, and also gave a warning signal to the Sagami, but the latter failed to stop, although the tow was then in sight, and proceeded alongside the transfer on the outer side, throwing the Minnie and her tow to the southward of the middle of the channel, which is 700 feet wide. The place was dangerous for tows at the time, owing to the flood tide which sets toward the rocks on the Long Island side, and, although the tug immediately turning across astern of the Sagami toward the opposite side, the tow swung

───────────

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

so near the shore that one of the barges struck the rocks, and was injured. *Held*, on the evidence, that the Minnie was not negligent, but that the fault was solely that of the Sagami, which should have stopped, as she might have done when warned by the transfer.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 81.*]

In Admiralty. Suit by the Philadelphia & Reading Railroad Company against the steam tug Minnie and steamship Sagami. Decree against the Sagami.

Armstrong, Brown & Boland, for libelant.
Carpenter, Park & Symmers, for the Minnie.
Convers & Kirlin, for the Sagami.

CHATFIELD, District Judge. On the afternoon of March 23, 1907, the day being clear and no breeze of consequence interfering, the Rhode Island (a barge laden with coal, and towed with six others by the Minnie) struck what is known as the Steep or Scaly Rocks at the south side of the channel, immediately east of Hell Gate, in the East River. Some dispute exists as to the time of the accident and the hour of flood tide, but the testimony of several witnesses is to the effect that the tide was running at the rate of over two knots an hour. Even if there were less tide, as is suggested by the witnesses for the Sagami, her speed through the water must have been less, and she should have been able to stop within a shorter distance; thus increasing her responsibility under the circumstances. The difference in fixing the time of the accident can be satisfactorily explained from the fact that the Sagami, which had traveled substantially half around the globe, was using sun time, while the difference in estimating the time of high water is due to the fact that the place in question is just west of where the flood tide up the East River and the flood tide west through Long Island Sound meet. The flood tide to the east is also affected by the tide coming down through the Harlem River and turning up the Sound, in the direction in which the Minnie and her tow were proceeding.

The Minnie is an ocean-going tug, some 120 feet in length. She was proceeding with a hawser, not less than 25 fathoms in length, to each of the outside barges of the first tier, while between the first and second tier of barges short hawsers of 12 or 15 feet were used. Four barges were towed alongside in the first tier, and three in the second tier. The tow passed through Hell Gate and substantially over or very close to Pot Rock, which is about in the middle of the geographical channel between Negro Point on Ward's Island and the Astoria shore on Long Island. The deep water extends within a very short distance of the Ward's Island Shore at Negro Point, and a tow of barges must keep toward the western or port side of midchannel as much as is possible or safe when proceeding up the river with a flood tide around this point, in order to keep the barges from swinging over against the Long Island shore, inasmuch as the junction of the flood tide coming up the East River and that coming out of the Harlem River causes a current to set from Pot Rock directly toward the Long Island shore, at

what is known as the Steep or Scaly Rocks, although it is admitted by all the witnesses that a barrel or small object borne by the tide over Pot Rock would be carried first toward Long Island, and then swung by the tide up the Sound, without striking the shore. It needs no argument to show that a wide tow of barges could not be handled in the path in which a small object would float, and the situation is obvious.

On the day in question the first boat to reach this particular locality which affected the situation was one of the transfers of the New York, New Haven & Hartford Railroad Company, which was proceeding down the East River with a loaded car float on each side, the tug being between the two floats, and the captain in the pilot house which projected above the tops of the cars and gave a clear view of the river. Upon rounding Negro Point Bluff on Ward's Island, the captain of the transfer saw the Minnie and her tow passing through Hell Gate, and still below Pot Rock or Negro Point. He thereupon lay to and remained in a position some 150 feet from shore, and just to the eastward of Negro Point. Immediately behind the transfer was the Sagami, an ocean steamer, bound at the time from Boston to New York, and under the direction at the time of a City Island pilot, licensed for the waters in question. The transfer gave what is called an alarm whistle to the Sagami. This signal was observed by the officers and pilot of the Sagami, and was interpreted by the pilot to mean that it would be dangerous for the Sagami to attempt to pass the transfer at the time in question. This signal gave the Sagami to understand that it would be dangerous to pass the transfer, and put the Sagami on guard, but, of course, could not indicate the precise danger or whether other boats were also in the way. But, inasmuch as the Sagami could see that the transfer was lying still and that there was sufficient room to pass, while by this time the Minnie with her tow must have been in sight, it must be held that the Sagami was thus apprised of the entire situation, being from that time on in the position of a steamboat proceeding against the flood tide, under such conditions as to be bound by the rule in the case of The Day Spring, decided August 31, 1894, in this district.

The Sagami is some 370 feet long by 50 feet wide. She was moving over the ground at some five or six knots an hour. The testimony shows beyond dispute that she stopped her engines, and at some time before she passed the transfer reversed. Her officers state that she lost way entirely and proceeded back, either under the reverse movement of her engines or the tide. But inasmuch as she continued to pass the transfer, and before she started up reached a position some one-half her length beyond the bow of the floats which the transfer was towing, it would seem to be necessary to conclude that during all or the greater part of the time in question she was proceeding against the tide, and had considerable way on, even if her engines had ceased to operate, after the alarm signal by the transfer. Some distance behind the Sagami was the Pathfinder, a government boat, which slowed up and remained in the neighborhood of Negro Point Bluff, and whose witnesses do not, to any extent, contradict the testimony of the libelant upon the material points of the case. Another vessel, the Santiago, was

back of the Minnie coming up the river, and passed the Sagami to starboard opposite Hallet's Point, after the various occurrences. The witnesses from the Santiago, as well generally give a similar version of the occurrences.

The first tier of the Minnie was comprised of 4 boats at least 30 feet in width, while the second tier was narrower by one boat, but the boat in the rear tier furthest to port was nearly on a line behind the outside port boat of the forward tier. The engines of the Minnie were stopped and a signal exchanged with the transfer some time before the alarm signal of the transfer to the Sagami; and under the influence of the tide the tow drifted, without much deviation from the course it had been pursuing, past Negro Point, but with a corresponding slackening of the hawser between the tug and the barges. As the tug reached a position opposite the transfer and apparently near the center of the channel, or possibly slightly to the Long Island side of the center, the Sagami had reached a point where she lay between the tug and the transfer with its floats, and was slowly passing to the westward. The witnesses upon the Minnie and upon the barges in the tow are of the opinion that as the Sagami felt the influence of the tide sweeping around Negro Point, her bow fell off to port, while the witnesses upon the Sagami are certain that the movements of her reversed screw and her helm kept her stem in line or swung her somewhat to the Ward's Island shore. But, however that may be, as the first tier of barges reached a point alongside of the port bow of the Sagami, some slight contact occurred, and the outside barge rubbed along the side of the steamer, but no damage resulted to either craft. The second tier of barges also seems to have been far enough to the north so that the outside barge came in contact with the side of the Sagami. The witnesses upon the barges estimate that the last tier of barges was swung to the south, through an arc of some 25 feet, while several of the Sagami's witnesses did not know that any actual contact resulted, and some of the witnesses on the other boats testify that the barges were not moved at all by the passage of the Sagami alongside. The Sagami, at the time she cleared the last barge, had worked far enough to the west to be able to port her helm and get underway across the bow of the car floats. She then, passing the Santiago to port, proceeded down the river with no knowledge of the subsequent occurrences to the barges, except a remark by the captain to the effect that the barges would get into trouble if they did not look out; this observation having been made when the Sagami was some distance down the river and turning the bend at Hell Gate.

The captain of the Minnie, considering that the set of the tide toward Long Island would carry his tow ashore, headed his tug under the stern of the Sagami, substantially across the river for Ward's Island, and thus drawing the barges into a position diagonally across the channel, at this point some 700 feet in width. The entire length of the tow was some 560 feet from the bow of the tug to the stern of the last barge, and it is evident that, if the Minnie was in midchannel at the time she started this maneuver, she would not have room to turn her tow in the southerly half of the channel, but that the last tier of

barges would certainly strike upon the Long Island shore, unless gotten underway and drawn across the tide a sufficient distance from the shore to avoid contact. The tendency caused by the set of the tide toward the Scaly Rocks would increase the effect of the rotary or pivot motion around the bitts of the forward barge upon the starboard side, which would be the center of rotation in such a maneuver; and, while the entire tow could in this way be started most quickly away from the shore and toward Ward's Island, it would seem, under the circumstances, that the stern of the starboard barge in the rear tow would be likely to strike, even if the entire tow were drawn away to a point where the other barges might be safe. The various witnesses called as experts, when questioned with reference to this maneuver, agreed in the opinion that the Minnie pursued the quickest method of withdrawing her tow from dangerous proximity to the shore, and these witnesses also agree that, if a straight course with the tide had been pursued, the entire tow would have gone ashore on the Long Island side of the channel. It will be seen that allowing 150 feet space between the car floats and the shore, with a width of 140 feet for the car floats, some 60 feet between the floats and the Sagami, and 50 feet for the width of the Sagami, the point of contact between the Sagami and the outside barge must have been about 400 feet from the Ward's Island shore, or at least half way across the channel; and the width of the barges, 130 feet more, taking into account also their course abruptly toward Long Island, makes it apparent that the Sagami was responsible for the situation in which the tow found itself, and must be held at fault for putting them in that situation, not only because she had plenty of opportunity and sufficient signals to warn her, but because she saw fit to run by the car floats after having received an alarm signal, and without waiting to find out if such maneuver would be safe.

The Sagami had a pilot who was used to those waters, and she must be held responsible for his failure to realize that the set of the tide and the size of the approaching tow would not leave room for the barges to pass through safely if he proceeded into a position in the middle of the channel at that precise point. A reference to the chart used on the trial and marked by the witnesses makes the situation quite apparent. While the Sagami did stop and did reverse, she does not seem to have made any attempt to avoid running alongside of the car floats and into a situation out of which danger resulted, and there is nothing to indicate that she could not have prevented the entire occurrence by greater caution. The Minnie is shown to have had sufficient power to handle her tow. The size and shape of the tow does not seem in any way to have been of itself dangerous, except in so far as any large or unwieldy tow may become dangerous in Hell Gate, if other vessels do not observe the necessary care due in that locality; and while the precise accident, namely, the striking of the rear barge, may have been the result of the Minnie's movements as a choice of evils, nevertheless there seems to be no negligence on her part, nor even any error of judgment, which caused the injury or contributed thereto. But the most that can be said is that her maneuvering shifted

the danger from one point to the other, and, in the absence of carelessness or fault on her part, she cannot be held responsible for any inability to extricate herself entirely from the situation of danger caused by the fault of the Sagami.

The libelant may have a decree against the Sagami, and the libel against the Minnie will be dismissed.